The third case is 23-113133 and 3-4 LeClair v. Tavenner. Mr. LeClair. Thank you. Good morning. May it please the Court. My name is Dave LeClair and I represent the appellant Gary LeClair. The court question in this appeal is whether Mr. LeClair continued to hold equity in his former law firm after his employment with that firm ended on July 31st of 2019. That question is a contract question governed by the firm's operating agreement and Section 202 provides the answer. It tells us that the firm redeemed Mr. LeClair's equity, meaning his shares, on the last day of his employment. Section 202's blanket resignation and redeem rule, as the district court called it, was automatic and absolute. Mr. LeClair did not take his equity with him when he left the firm and he was not an equity security holder of the firm when it petitioned for bankruptcy the following September. The district court erred in concluding otherwise because its two-part analysis was flawed at both steps. First, the district court bypassed Section 202's resignation and redeem rule by creating a post-dissolution exception that does not exist out of a fragment of one sentence in Section 503 which says the opposite. Second, the district court misapplied the exception it created based on a purported dissolution that did not occur and could not have occurred while Mr. LeClair continued to hold equity. Both parts of the district court's two-part analysis were flawed and both of those flaws independently require reversal, but today I'd like to focus on the first one. We believe this court's inquiry should begin and end at that threshold because there was no post-dissolution exception to the resignation and redeem rule. The operating agreement speaks for itself on this point and today I intend to let it do that by walking through with the contract itself says it says. Beginning with Section 202 followed by Section 503. Section 202 picks up in Article 2 which is at JA 338 and Article 2 covers transfers, restrictions, and other buy-sell terms involving firm equity, again we're shares of the firm. It is the only article of the operating agreement that does that and Section 209 tells us that the preceding sections of Article 2 including Section 202 quote constitute the exclusive mechanism for the redemption, repurchase, or acquisition of the equity of a member. So Article 2's exclusive mechanism begins at 202A which states at JA 339 that when a member's employment ends for any reason that member becomes a terminating member. The firm was required to quote purchase and redeem all shares held by the transferring member immediately prior to termination. What's the consequence of ruling in your favor here? What would be the consequence of that? Well the relief we're requesting your honor is that the case be reversed and remanded for Mr. Leclerc's removal from the equity security holder list. It's very narrow and we just believe that he should be removed as he has not been an equity security holder since the firm redeemed his shares. So does it change the firm's tax status? I don't believe it would your honor. Frankly we don't know because the same analysis, I mean the operating agreement is the same for all of the former members but it's going to depend on each of their unique facts and circumstances. So I can't really speak to how it would affect others or the firm itself but I can say that we do believe based on the plain language that Mr. Leclerc must be removed. So you're saying if we agree with you on this section 5.03 that we, what do we do, vacate or do we remand? Well I reckon the court would have some latitude there. I believe the proper course would be to remand it with instructions that he be removed from the list because the list is currently existing in the bankruptcy. So technically I believe that would involve two steps of remand. I don't believe it does in this case your honor. I mean again this is controlled by the operating agreement and the plain language. It's a legal question as to whether he was an equity security holder and we believe it's clear that he was not. So this is kind of related to Judge Wynn's question and you suggested that it's not clear whether or not there are any consequences but isn't that, I mean if there are not any consequences then why are we deciding this issue? Well as to Mr. Leclerc it would be determinative that he's not an equity security holder as of July 31st, 2019. I can't speak to the consequences for other members or the firm. What's the consequences of him not being an equity shareholder on that date? Well it would result in the correction of what we believe is an incorrect order which states that he was an equity security holder and I believe what your honor is getting at is this will have tax consequences downstream. This won't address those but his classification as an equity security holder is incorrect in the first instance. We believe that error just needs to be addressed at the outset. How would you have us read section 5.03 of the operating agreement? Sure. And that's where a significant amount of the confusion in this case has come from. Now to begin I mean again article 2 and section 202 in particular is the exclusive mechanism. So as far as article 5 goes which is where section 503 is, I want to emphasize that that governs membership not ownership or redemption of equity. Neither 503 nor any other section with article 5 speaks to whether or how a person acquires or retains equity. And again that makes sense because article 2 is the exclusive mechanism there. And so I want to look back at article 2 I think to fully answer your honors question and then we'll bounce back one last time because these really are the two provisions of control. But in the first instance so article 202A lays out this requirement that the sales be purchased and redeemed immediately prior to termination. And then 202G reiterates that at JA 344. It tells us that all quote shares shall be deemed sold and transferred to the firm as of the termination date. And that's true irrespective of whether the transferring member provides certificates or any other documents requested by the firm. So we believe the district court was correct that section 202 is indeed a blanket resignation and redeem rule. The blanket rule was as much an ethical requirement. It was a practical necessity of operating a legal practice. It restricted ownership of the firm to employees who were practicing attorneys employed by the firm. That precluded anyone from continuing to hold equity if they stopped practicing law or if they left the firm to practice law elsewhere. And 204B reiterates this point at JA 346. But he was a member of the firm at the time of the dissolution. Well respectfully we disagree that there was a dissolution in the first instance. Juan, that's why I was asking you about the other section, the section 503 and others that seemed to indicate there was a dissolution and he could no longer withdraw from the firm. Right. All right. So yeah, I'll turn to 503. And no, we don't believe that 503 had anything in this case to do with dissolution. And again, in context, 503 doesn't speak to whether Mr. LeClaire held equity after his employment ended. Article 2 does that. Article 2 does not contain the word dissolution. All section 503 did. But Article 2 speaks to whether he held equity, what did you say, after his employment ended? Correct. But his employment didn't end at the time of the dissolution. Correct. I'm sorry. The agreement. Yes, his employment ended on July 31st. These July resolutions, again, we do not agree that there was a dissolution. That's a separate issue. Dissolution doesn't matter here on the first question. And so while he was an employee on July 29th when that vote was taken, he was not an employee on July 31st, which is really the operative date here. So what section 503 did is it modified the Virginia LLC Act's default rules by linking the firm's membership to its ownership, to its shareholders. And it did that because it conditioned each person's status as a member on whether that person continued or ceased to hold shares. On the one hand, so long as a person continued to hold any shares, that person could not withdraw or resign as a member. On the other hand, as soon as a person ceased to hold any shares, that person was no longer a member. So those alternative scenarios are laid out in the second and third sentences of 503. But we have to look, again, back to 202, the exclusive mechanism to determine which of the alternative shared areas we're in. And in this case, we know to apply the second, excuse me, the third sentence, because Mr. LeClair ceased to hold. What if there was a dissolution on July 29th? Right. Assuming for sake of argument that there was a dissolution on the 29th, it would make no difference. Why not? Because the question here is whether Mr. LeClair held equity after he left on July 31st. And then that's where you want us to go back to Section 202. Correct.  And then remember, the equity security holder list, right, giving rise to all this, is dated more than a month later. That's September of 2019. So it really doesn't matter whether Mr. LeClair was a member on the 29th or the 31st. We know it ended on the 31st, and he was absolutely not an equity security holder in September. And again, so these alternative scenarios are laid out in the second and third sentences. In this case, we know to apply the third sentence, because Mr. LeClair ceased to hold any shares when the firm redeemed his equity on July 31st. So 503 tells us he was no longer a member as soon as that happened. Let me be clear. What do you say this Section 503 reference to prior to the dissolution and winding up the firm? What do you say that means? Right. That means just during the life of the company? That's precisely what it means, Your Honor. And there's been a lot of confusion over that second sentence because it uses the word dissolution. So I'll clarify exactly what that sentence does based on exactly what it says, right? So what it does is it prevented Mr. LeClair and everyone else from withdrawing as a member of the firm while continuing to hold equity in the firm. That limitation was meaningful because Virginia LLC's Act, excuse me, Virginia's LLC Act, would have otherwise allowed the firm's shareholders to withdraw as members and then keep equity as former members. But isn't the additional caveat is so long prior to dissolution? I mean, you couldn't do that prior to dissolution. Now, we don't believe that's a caveat at all. That limitation on member withdrawal was operative, as the Court has pointed out, for the entirety of the firm's existence, right? From its inception through dissolution and through winding up. The only qualification here is that the operative limitation on member withdrawal only applied so long as a person continued to hold shares. So really, that's the question. So long as a person continued to hold shares, did they? And 202 tells us the answer. Now, we also know based on what 503 actually says that the second sentence wasn't a post-dissolution exception to 202 because the district court's interpretation violated virtually every principle of contract interpretation to make it an exception. First, the district court had to essentially delete the so long as qualification, everything before the first comma of the second sentence of 503. And in its analysis, it even capitalized the S and such as if there was no first part of that sentence. That qualification is there and it controls. Then, the district court had to rewrite what was left of the second sentence by changing prior to dissolution and winding up to mean post-dissolution. But prior to dissolution and winding up doesn't mean post-dissolution. Prior doesn't mean post. The limitation on member withdrawal, again, it didn't spring to life post-dissolution. It was operative prior to dissolution and winding up. And it was only applied so long as a member continued to hold shares. Even if we could change prior to post, 503 would still just be a limitation on member withdrawal, not an unwritten exception to 202's exclusive mechanism for the redemption of equity. And finally, after deleting the first part of the second sentence and rewriting what was left, the district court had to ignore the third sentence entirely. And it treated the third sentence as though it, quote, does not apply once the dissolution process begins. And that's a JA 1070. But the third sentence, just like 202, says nothing about dissolution whatsoever. What the third sentence actually says is that as soon as a person who is a member ceases to hold any shares, such person shall no longer be a member, period. This was true before, during, and after any prospect of dissolution. And just like 202's resignation and redeem rule, which had no exception, there was no post-dissolution exception to the third sentence of 503. So in every way, the district court misinterpreted 503 to mean the exact opposite of what it says. And the operating agreement speaks for itself. Section 202 tells us Mr. LeClaire's shares were purchased and redeemed by the firm and even sold and transferred to the firm as of his termination date, July 31, 2019. 503 tells us that Mr. LeClaire could not have withdrawn as a member before the firm redeemed his shares, but he was no longer a member as soon as it did. And we believe this court's inquiry should stop there with the plain language of 202 and 503. It does not matter whether or when there was a dissolution, although for the reasons stated on brief, we believe there was none. Thank you very much. Thank you. Ms. Barron. May it please the court. For the record, my name is Paula Steinhelber Barron. I'm with the law firm of Tavener and Barron. I am representing the appellee, Ms. Lynn Lewis Tavener, the Chapter 7 trustee of the LeClaire I.M. Bankruptcy Estate, who is with me today in the courtroom sitting in the front row directly behind me. Having started my legal career a little over 32 years ago in this very courthouse... I'm sorry to interrupt, but could you either speak up or maybe... Certainly, Your Honor. Thank you. Is that better, Your Honor? Uh-huh. Having started my legal career a little over 32 years ago, Your Honor, in this very courthouse with this court's staff counsel's office, it is truly an honor and pleasure to be standing before you today. It is a little bit different and unusual to be standing before you today analyzing, of all things, a firm, a law firm, who chose to shut its door and cease operating its business, corporate legal governance documents. But I do find myself doing that. And I find myself doing that to interpret this document with Your Honors after three other groups or entities have already interpreted the document substantially the same way. And those five groups would be the firm's leadership back in September of 2019 when they looked at this issue. They're the ones that compiled the equity security holder list. The firm's legal counsel at that time, which was a big national law firm, Hunt and Williams, who signed the equity security holder list. Thereafter, the trustee. Thereafter, in my humble opinion, one of the best bankruptcy judges in this country, the Honorable Kevin R. Hennekins. And thereafter, a very well-known and distinguished and thorough district court judge, Judge David Novak. All five of those groups or individuals interpreted this document substantially the same way. Let's start, though, with the very issue that my learned counsel wants the court to focus on, and that is Section 2.02. But as Your Honors, Judge Wynn and Judge Thatcher both point out, you can't just write 5.03 out of the document. Like Judge Novak said, you have to look at this document, as this court said in the Levin case, you have to look at all aspects of the document to have it make sense. Even counsel for the general counsel of the firm said, the way Mr. LeClair is viewing this document makes no sense, and that's in the joint appendix. But let's look at what 5.03 says, as Your Honor did. Your Honor, the 5.03 says specifically, and I quote it again to Your Honors, it says, no withdrawal. It's not just disassociation or anything like that. That section starts with no withdrawal. And then the sentence that opposing counsel wants to just completely write out of this operating agreement, as Your Honors have pointed out, it says, such members shall not have the ability to withdraw or resign as a member prior to the dissolution and winding up of the company, and any such withdrawal or resignation or attempted withdrawal or resignation by any member prior to the dissolution or winding up of the company shall be null and void and of no force or effect. You can't read that sentence and then say, okay, but we're going to invoke 2.02 to say we're now no longer a member. We're withdrawing under the terms of 2.02, and we want the shares redeemed. We're not here standing to say that 2.02 will never be in effect. It actually probably will be in effect once the company has completed its windup. What would be the starting point at which they could withdraw? Your Honor, we would respectfully submit that once the firm elected to dissolve, and I think it's undisputed that the firm elected to dissolve on July 29th. Elected to dissolve? Well, opposing counsel disputes it. He says there was no dissolution at all. Well, Your Honor, with all due respect to opposing counsel, he gets there and I'll address the quote-unquote block. But let's first look, though, at what transpired and look at what 11.02 says and 11.01 says. When you look at 11.02, that's what talks about effectiveness of dissolution. That's even what it says. And it says, dissolution is effective. I don't want to paraphrase. Let's quote the actual document here. 11.02, dissolution of the company shall be effective on the day on which the event described in 11.01 occurs. So the day that occurs, let's then go to 11.01. I'm not going to paraphrase. Let's quote it. The company shall be dissolved and its affairs wound up only upon the occurrence of any of the following. And this is one of the following. An election to dissolve the company made by the holders of a majority of the common shares. I don't believe the record has any dispute that on July 29th, a majority of the common shares elected to dissolve. You can find that in the joint appendix in the resolution itself. You can find that in the joint appendix in connection with the declaration that was filed by the dissolution committee. And she happened to be the former legal counsel for LeClaire. And that can be found with the petition. And you can also find it in connection with the resolution to file the bankruptcy case. All of which were before. Yes, John? Was it terminated at dissolution in your view on July 29th, but his employment is terminated July 31st? It's undisputed. I'm not here to dispute that Mr. LeClaire did leave the firm's employee on July 31st. Was he a part of the – you can have a dissolution. The question is, is it valid without his vote? Because doesn't he have something like a controlling share? He's one of those kind of super shareholders there. You can't really do that without him, could you? Judge Wynn, I hear what you're saying there, but I would respectfully disagree that you could do it in this instance. What was his share? What was his interest in it? Well, Mr. LeClaire held both common shares as well as preferred stocks. You're saying they could dissolve it without – it would be – his consent or his participation. Well, Your Honor, there's been much to do about that Mr. LeClaire did not provide a formal written consent to the firm's dissolution. And candidly, I don't believe it's any – it would surprise anyone for me to say that I haven't always agreed with Judge Novak. But in this instance, I do believe Judge Novak is a brilliant man and he's a very thorough man. And what Judge Novak did in this instance was absolutely correct. And Judge Hennekins did it in this instance. You look at the document as a whole, Your Honor, okay? And when you look at the document as a whole, and I could point to all the provisions, what the document says is once you give your resignation to leave the firm, your indication you're leaving the firm, you no longer can participate in the firm's corporate governance. So I would respectfully submit, just like Judge Novak indicated, that under the section, which specifically is 9.08G, that Mr. LeClaire was no longer able to vote and his consent was no longer necessary. Can I take that? I mean, it says you can't do it without his written consent or affirmative vote. Your Honor, I respectfully submit, I know Mr. LeClaire would say that Judge Novak – I'm just looking at this section here. You went to G. I said look at the other section. It says you can't do it without his written consent to vote. I would respectfully submit that his vote wasn't necessary, even under I at that point in time, because he was no longer participating. But, Your Honor, I would take you one step further and say – Let me understand, because I'm saying it says that the company can't dissolve without his written consent or affirmative vote. You agree to that? Yes, Your Honor. But you say that doesn't mean anything? No, I believe it does mean something, until up to the point that Mr. LeClaire tendered his resignation on July 26th. Once he tendered his resignation, he no longer was able to participate in the firm's corporate governance. But, Your Honor, you don't have to – But his employment didn't terminate until July 31st? Correct, Your Honor. Mr. LeClaire left the firm's employ on July 31st. But, Your Honor, I don't – I think even if you have trouble with what Judge Novak stated in connection with viewing it all as one, and that because he had given his resignation, he was no longer able to participate in the firm's corporate governance, I think Your Honors can still – and I would respectfully submit that Your Honors should still affirm the lower court's decisions. Because if you look at what Judge Hennekins did, Judge Hennekins also went one step further to say, okay, well, this block is ineffective as well because Mr. LeClaire, under this court's Hager case, affirmatively ratified it. And I think that is very consistent with the facts before this court as well as, Your Honors, with the operating agreement in and of itself. And when I say it's consistent with the operating agreement, Your Honor, go down a little bit further. Go down to 9.08K, as in King. One of the ways in which you can vote, it specifically says go to the very last clause or other indication of approval by the members entitled to state such action. So in this instance – In other sections it talks about those who are entitled to vote. That I doesn't deal with entitlement to vote. But what K, the section I'm pointing out now, says how you can vote or how you can provide affirmative consent. And in this – Entitled to vote, I agree. Yes, Your Honor. But let's look at what the court in Hager said and let's look at what Judge Hennekins looked at. Hager said you can affirmatively ratify an action if you do one of two things. One, you don't promptly disavow that action. I don't think anyone could argue with a straight face that Mr. LeClaire promptly ratified the action, I mean promptly disavowed the action. Let's look what happened. That action happened in July. The bankruptcy case was filed in September. What does Mr. LeClaire do for almost two and a half years? He pesters the trustee to fix his issue by saying you need to change this tax entity from a pass-through entity to a taxable at the corporate level entity, which the case law says the trustee doesn't have authority to do that. That type of action resides with the owners, not with the entity. So then what does Mr. LeClaire do? In November, two and a half years later, he still doesn't raise the block. He still doesn't disavow. The issue is brought to before the court in November. It's not until March, two years and eight months later, does Mr. LeClaire raise the block issue in a footnote two business days before the hearing. In the meantime, in that two years and eight months, Mr. LeClaire took advantage of the firm's process to receive client files. Mr. LeClaire took advantage of the bankruptcy process. You've got Hager, which deals with the ratification of the bankruptcy itself. Yes, Your Honor. Beyond that, there's a question of whether he did so for the dissolution. Aren't those two different questions? Isn't that a different question than what was presented in Hager? It's a different question as to what's being ratified, but it's not a different question as to the form of ratification. Did we even know he was aware of the dissolution vote? I'm sorry, Your Honor? Do we know that LeClaire was aware of the dissolution vote? I would respectfully submit that, Your Honor, Mr. LeClaire was aware of the dissolution vote. I mean, in essence, on the July 26th email, the two… He was aware of the bankruptcy, and Hager would apply to that, but the dissolution vote is a different matter. Wouldn't you have to at least establish he was aware of who this was going on, if he's going to consent or waive or something? Your Honor, I would respectfully submit that Mr. LeClaire was very much aware of the dissolution vote. Based on what? On the record, let's start first and foremost, Your Honor. On the July 26th email that was sent, that was in response to Mr. Gustafson's email and discussions about the vote coming up on July and in connection with that vote. Mr. Gustafson's email mentions dissolution? Because Mr. LeClaire's does not. I don't think that Mr. Gustafson's email specifically uses the words dissolution. I don't believe it does, but I could be mistaken on that. It is Mr. LeClaire's July 26th email, so how is that an indication that he knew about the dissolution being imminent? Your Honor, in connection with the dissolution, what was happening at the time and in connection with how and where I could point Your Honor to in the record to have evidence of this, it would be in the declaration of Ms. Lori Thompson that was filed on the very first day of the bankruptcy case as well as then on the resolutions of the dissolution committee. It was in connection with winding up the affairs that this process was going on and the vote occurred on July 29th. Mr. LeClaire was still at the firm on July 29th. Can I go back to the dates and the operating agreement and make sure I understand what you're saying? So on July 26th, that's when Mr. LeClaire indicated he wanted to withdraw. And you're saying that as of that moment, July 26th, pursuant to 9.08G of the operating agreement, he can no longer participate in firm governance. Yes, Your Honor. But then on July 29th, when the firm decided to dissolve, pursuant to 5.03 of the operating agreement, he could also no longer withdraw. Correct, Your Honor. So now he can't withdraw and he can't participate. He seems to be in a catch-22 situation there. With all due respect, the two solutions there would have been when he gave his resignation, he could have left. If he had left before the vote on July 29th, arguably, we wouldn't be standing here because he wouldn't have been included. He had read the operating agreement the way the rest of his partners clearly did. Absolutely, Your Honor. And, Your Honor, the other thing that could... 2.02. You go ahead. No, no, go ahead. 2.02 fit into this? Well, 2.02 is the way in which if you were a withdrawing member or a transferring member, the firm redeemed your shares and provided all the mechanisms of the dollar amount and evaluation. So you're saying it has no place here at all because, based on what I just went through in the operating agreement, he wasn't a withdrawing member because he couldn't withdraw after July 29th. Your Honor, I would agree with everything with one caveat. It ultimately could come into place. It's just put on hold. It's put on hold because of 5.03. We're not going to invoke that provision because 5.03 says you don't invoke it, any attempt, any withdrawal, anything. So that's put on hold until such time as the firm has been wound up. Okay. So can I ask about 5.03 and the orders below? So if I'm understanding what the bankruptcy court and the district court decided is that following dissolution, the operating agreement bars withdrawal by anyone, full stop. Is that what they said? Correct, Your Honor, until the entity has been wound up. So where in the operating agreement does it say that? Because it would have been easy to say following an event of dissolution, no member can withdraw full stop. It doesn't say that. Where does it say that? Well, Your Honor, I would respectfully submit that that's what the middle sentence of 5.03 does say, any attempt to withdrawal. I apologize, Your Honor, and it's kind of ironic that when I go to sporting events, people think I have a loud mouth, so I apologize. In connection with this very sentence of 5.03 that we've been talking about, that's where the firm has said that. What's the sentence? 5.03 specifically says no withdrawal. That's the caption of the operating agreement. What's the text say? So long as a member continues to hold shares, such members shall not have the ability to withdraw or resign as a member prior to the dissolution and winding up. Prior to the dissolution. Where does it say that you can't withdraw after the dissolution? Well, it says dissolution and winding up. So you need both events to happen. The firm hasn't been completely wound up. So it's been dissolved, but it hasn't been wound up. Once the windup is finished, then. But what is the word prior doing there? It's saying it needs both. You need prior. It doesn't say prior or after. It says prior. It doesn't say anything about whether or not a member can withdraw after. But the dissolution has begun, so you need dissolution and winding up. I would respectfully submit, Your Honor. I'm not sure where that gets you. It just seems to me that the text of this section of the operating agreement is talking about events prior to dissolution, but it's completely silent as to whether or not a member can withdraw afterwards. It would have been, don't you think, a lot easier to say no one can withdraw after dissolution, full stop. It doesn't say that. Your Honor, I would agree. It does not specifically say that. But where does the district court and bankruptcy court get that result? Your Honor, I would respectfully submit that they get it in connection with 5.03, that exact language where it says dissolution and winding up. I would respectfully submit you have to look at both concepts. And here, dissolution began. Clearly, dissolution began. Now, we have to wait for the winding up to occur. Once the winding up occurs, Mr. LeClair can invoke, and all of the others can invoke, the 2.02 and say their shares have been redeemed. Now, the bankruptcy court would govern the value of those shares, but it's at that point in time that you cease to be an equity security holder. Otherwise, Your Honor, if you think about it, the process makes no sense. Because if you take Mr. LeClair, and I see I'm almost up, if I may have just a minute to finish that thought. If you take Mr. LeClair's theory to its end, as of the bankruptcy filing, and Judge Wynn, this kind of goes to one of your questions, there technically then were no equity security holders on the day of the bankruptcy filing. And so you have an entity that has no equity security holders, but it's still a PLC? I mean, that makes no sense. I mean, unfortunately, what could have, should have maybe happened here is they should have, at that point in time, converted back to what they were for most of their existence. And that would be a PC. But they didn't do that. They put this bankruptcy in as a PLC. They put it in as a PLC with equity security holder list of all people and all members who held equity security as of July 29th. That's what the leaders of the firm did at the time. That's what Bankruptcy Council did at the time. Based on the same, Your Honor, I do respectfully submit that when you read the contract here at issue, and that is this operating agreement, and you read all provisions of it, the district court and the bankruptcy court got it right. And we respectfully request that Your Honors affirm those decisions. All right. Thank you very much. Thank you. Mr. Berry? Four points I'd like to make. The first is the same point I made at the very outset. The core question in this case is a contract question. It doesn't matter how the bankruptcy or district court interpreted this agreement because this court reviews that de novo. It's a question of law. And I would respectfully disagree that all of the firm's members read it the same way because there were quite a few appellants to the district court who, unfortunately, are not with us today but that are perfectly consistent with our interpretation. The second point deals with the second issue, which I didn't really address at the outset. But I want to emphasize that both the bankruptcy court and the district court recognized that dissolution required two levels of approval under the operating agreement. Now, the first was Section 1101, which required an election by the holders of a majority of the common shares. But the second one, the preferred share protective provision, stated that in addition to any other vote required by the operating agreement, that's in Section 908I, the written consent or affirmative vote, the holders of a majority of the then outstanding preferred shares, was required before the firm could dissolve. Now, as I mentioned, the second requirement was a preferred share protective provision, and it was not satisfied. There's no dispute that Mr. Leclerc held a majority of the then outstanding preferred shares, and there's no dispute that he never gave his written consent or his affirmative vote. So under the plain language of Section 908I, which applied any time preferred shares were outstanding, and in addition to any other vote required. The note of the dissolution vote? I'm sorry? The note of the dissolution vote. The record doesn't reflect that, Your Honor. It doesn't say one way or the other. And there's no evidence on the point. But what we do know is that he never gave his affirmative vote a written consent. And so under 908I, the firm could not have been dissolved, and so there could be no effective date under 1102 or 1101. As of 9-3, there would be no shareholders? I'm sorry? If I follow the line of reasoning from Ms. Barron, as of September 3, there would be no shareholders? I don't know that I can speak. It would depend on whether there were any employees or whether they had all left. And I don't know the answer to that. I'm not sure that the record reflects it. I can say again with confidence that Mr. Leclerc was not a member as of July 31, 2019. So this decision, anything we issue from here, we agree with you, would only impact him? That's all. He's the only one before the court, Your Honor. So what happens? His shares just be split up with the other members? Well, they would be redeemed, right? I mean, they were redeemed, so they just ceased to exist. I'm not sure how they would be dealt with beyond that. You've got this list. You've got the contract. Then you have the bankruptcy rule, 1009 or something, that says a bankruptcy judge can, on a motion to amend, has discretion. And you're saying the contract takes that discretion from it? Yes. I don't believe that the court would, any court would have discretion to rule contrary to law. And the operating agreements of the government… Contrary to law would be a question of whether to amend it. Right, right. And the contract, again, here tells us the answer. Again, it's a legal question. This court decides it de novo. Why would he still have that discretion? We could send it back and he could exercise it if he wanted to. I don't believe so, Your Honor. And that's why we request instructions to enforce the operating agreement as written, which requires his removal. He was not an equity security holder as of July 31st. I don't believe there's any discretion involved. The third point I'd like to make is that as to the dissolution issue, the district court essentially bypassed the preferred share protective provision the same way it bypassed 202. But in the instance of 908I, what it did was it replaced then outstanding with entitled to vote. But the issue wasn't whether Mr. LeClaire was entitled to vote his common shares. 908I's protective share protective provisions applied to then outstanding shares. And, again, there's no dispute that he held a majority of the then outstanding preferred shares. So the dissolution issue actually implicates the same interpretive issues that the first part of this case addresses. But, again, the court doesn't need to reach dissolution because it does not matter under 202 and 503. The last point I want to address is ratification. I think we've pretty adequately covered this in our briefing. But two points. First of all, Mr. LeClaire never consented to anything when he tendered his resignation. It doesn't mention dissolution. It doesn't mention winding up. And he never objected to the bankruptcy proceeding because he's got no concern with it. The issue of dissolution didn't arise until in response to the motion to amend the list. And at that point, ever since, when it was raised, he's taken the same position. He's never raised it. Do you agree with your friend on the other side that once the firm voted to dissolve, and I get the point you don't think that they did, but let's assume that they did, that the members were then barred from redeeming their shares? Absolutely not. Okay. 503 doesn't say that. Correct. So why isn't that the answer? It is. So why are we talking about all these other? We shouldn't be, Your Honor. I agree. The first issue is determinative. All right. Thank you. Thank you very much. Appreciate your arguments. We'll come down and greet counsel and move on to our final case.
judges: Albert Diaz, James Andrew Wynn, Stephanie D. Thacker